**Raymond SIZEMORE, Plaintiff,**

v.

**CITY OF DALLAS, a municipality, Dallas Police Department, and Chief James Harper, Sergeant John Wallace, and Lieutenant Tom Simpson, individually and in their official capacity, Defendants.**

**Civil No. 04–1114 AS.**

United States District Court,
D. Oregon.

Aug. 9, 2006.

Craig A. Crispin, Crispin Employment Lawyers, Portland, OR, Shelley D. Russell, Crispin Employment Lawyers, Portland, OR, for Plaintiff.

Karen M. O'Kasey, Hoffman Hart & Wagner, LLP, Robert S. Wagner, Stan Legore, Miller & Wagner, LLP, Portland, OR, for Defendants.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

In a Findings and Recommendation dated May 22, 2006, Magistrate Judge Ashmanskas recommended granting in part a Motion for Summary Judgment filed by the City of Dallas (City), the Dallas Police Department (Department), Chief James Harper (Harper), and Lieutenant Tom Simpson (Simpson). The Findings and Recommendation concludes that the Motion should be granted, with the exception of plaintiff's claim for retaliation against the City and Harper and punitive damages on that claim. The Findings and Recommendation also recommended granting a Motion for Summary Judgment filed by Sergeant John Wallace (Wallace). Plaintiff and defendants filed objections to the Findings and Recommendation.

When a party objects to any portion of a Magistrate Judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Business Mach., Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981).

Both plaintiff's and defendants' objections were filed in a timely manner. The court has given the file of this case a *de novo* review, and has also carefully evaluated the Magistrate's Findings and Recommendation, the objections, and the entire record. For the reasons below, the court sustains plaintiffs' objections in part and denies defendants' objections.

## ANALYSIS

The Magistrate Judge's presentation of the facts and issues in this matter is com-

prehensive and the relevant facts need be recited only briefly. Plaintiff is a former police officer for the City. Plaintiff brings claims under state law, 42 U.S.C. §§ 1981 & 1983, and 42 U.S.C. § 2000e, *et. seq.* (Title VII), for racial harassment, racial discrimination, retaliation, violations of the First Amendment, violations of Equal Protection, intentional infliction of emotional distress, and punitive damages. The Findings and Recommendation concluded that summary judgment should be granted against plaintiff's claims of discrimination, First Amendment retaliation, constructive discharge, intentional infliction of emotional distress, and the retaliation claim against defendant Wallace. The Findings and Recommendation preserved for trial plaintiff's claim of retaliation against the City and Harper, and plaintiff's punitive damages claim against Harper.

*Defendants' Objections*

The City and Harper object to the recommendation that plaintiff be allowed to proceed on his claim of racial discrimination for retaliatory acts against them. Defendants Harper and the City argue that plaintiff failed to present substantial and specific evidence establishing a causal connection between his complaints and the alleged adverse actions.

"Very little" direct evidence is required to raise an issue of material fact and survive summary judgment. *Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1095 (9th Cir.2005).

In concluding that plaintiff met his burden of establishing a *prima facie* case of retaliation, the Findings and Recommendation relied on the direct evidence that Harper threatened to make plaintiff's life complicated and uncomfortable and to greatly diminish plaintiff's career opportunities if plaintiff pursued his complaints. Findings and Recommendation at 15–16. As noted by the Findings and Recommendation, shortly after these threats, the ad-

verse employment actions commenced. *Id.* at 16.

This court finds the Findings and Recommendation's analysis to be sound and concurs that plaintiff met his burden in establishing a *prima facie* case for retaliation. Defendants' objections are overruled.

■ As a point of clarification, this court notes that plaintiff cannot maintain a retaliation claim under 42 U.S.C. § 1983 based upon an alleged Equal Protection violation. Although the Ninth Circuit has not addressed this issue directly, it has noted in dicta that if a plaintiff's claims under Title VII were viable, that plaintiff "probably could not have pursued Section 1983 claims based on the same discriminatory and retaliatory acts." *Learned v. City of Bellevue,* 860 F.2d 928, 933 (9th Cir.1988).

Many other circuits have drawn similar conclusions more directly. *Pagan v. Calderon,* 448 F.3d 16, 36 (1st Cir.2006) (a plaintiff challenging a discretionary decision to deny a benefit claims and seeking redress based on allegations of unconstitutional political discrimination or retaliation cannot rely on the Equal Protection Clause but must bring a claim under the First Amendment); *Maldonado v. City of Altus,* 433 F.3d 1294, 1308 (10th Cir.2006) (citations omitted) (to the extent the plaintiffs raise a retaliation claim under 42 U.S.C. § 1983 asserting violations of Equal Protection, the Tenth Circuit has long held that such a theory of liability for retaliatory conduct falls outside of § 1983); *Boyd v. Ill. State Police,* 384 F.3d 888, 898 (7th Cir.2004) ("the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the Equal Protection Clause"); *Rosenfeld v. Egy,* 346 F.3d 11, 15 (1st Cir.2003) (rejecting Equal Protection claim premised on allegations of retaliatory refusal to grant a

license because the claim substantially overlapped with the plaintiff's First Amendment claim); *Bernheim v. Litt,* 79 F.3d 318, 323 (2nd Cir.1996) ("we know of no court that has recognized a claim under the Equal Protection Clause for retaliation following complaints of racial discrimination"); *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1205 (6th Cir.1984) (the defendants' "only wrongful act was their retaliation for the plaintiff's actions, a violation of Title VII. We conclude that Congress did not intend this violation to be the basis of a § 1983 claim").

Based upon the reasoning provided in these decisions, this court concludes that plaintiff is precluded from bringing a retaliation claim under 42 U.S.C. § 1983 based on alleged violations of his Equal Protection rights. Plaintiff's retaliation claims under Title VII, § 1981, and Oregon law remain.

As to plaintiff's retaliation claims against the individual defendants, this court concurs with the Findings and Recommendation that plaintiff failed to demonstrate a *prima facie* case of retaliation by defendants Wallace and Simpson but met his burden of demonstrating retaliation by Harper.

*Plaintiff's Objections*

1. Racial Discrimination

Plaintiff objects to the Findings and Recommendation's conclusion that no issue of material fact exists in regards to plaintiff's claim of racial discrimination.

■ The Findings and Recommendation found that there was direct evidence that Wallace made a number of racist comments to plaintiff and that Harper threatened to retaliate against plaintiff if he continued to complain. Findings and Recommendation at 10. However, the Findings and Recommendation concluded that a *prima facie* case of discrimination was not presented in light of the length of time

that passed from the cessation of the racist comments until the constructive discharge, the fact that Wallace was not a decision maker with regards to plaintiff, and the nature of the retaliatory acts. Findings and Recommendation at 10.

The Findings and Recommendation then analyzed whether plaintiff established a *prima facie* case of discrimination based on circumstantial evidence. *Id.* at 10. The Findings and Recommendation found that plaintiff was subject to adverse employment actions, but that "the court is not convinced that any of these acts occurred solely because of plaintiff's race." *Id.* at 11. The Findings and Recommendation concluded that the adverse employment actions were not based on plaintiff's race, but rather on plaintiff's complaints of racial harassment. *Id.* at 12.

Plaintiff argues that the Findings and Recommendation erred in considering the direct and circumstantial evidence separately in deciding whether plaintiff established a *prima facie* case of discrimination based on race. This argument is well-taken.

A *prima facie* case can be demonstrated from circumstantial or direct evidence, and the amount evidence that must be produced is very little. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994). In determining whether sufficient evidence has been produced to survive summary judgment, circumstantial and direct evidence should be treated alike. *See Desert Palace v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1030 (9th Cir.2006). As noted in the Findings and Recommendation, plaintiff has produced ample evidence that he was subjected to racial discrimination. Findings and Recommendation at 10.

Plaintiff also objects to the Findings and Recommendation's conclusion that a *prima*

*facie* case was not established because plaintiff failed to prove that the adverse employment actions occurred "solely" because of racial discrimination. *Id.* at 11.

■ Title VII provides that an unlawful employment practice is established when discrimination is "a motivating factor" for any employment practice. 42 U.S.C. § 2000e–2(m). It also states that is an unlawful employment practice to take an adverse employment action "because of" race, color, religion, sex, or national origin. § 2000e–2(a). There is no requirement that a plaintiff must demonstrate that discrimination is the sole motivation for an adverse employment action. Accordingly, this court concludes that the Findings and Recommendations erred in requiring plaintiff to demonstrate that the adverse employment actions occurred solely because of discrimination.

■ Moreover, the Findings and Recommendation opined that "the court is not convinced that any of these acts occurred solely because of Plaintiff's race," indicating a weighing of the evidence and determination of motivation. Findings and Recommendation at 11. Such evaluations are generally the province of the jury and not a court at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is particularly inappropriate in discrimination cases where intent is involved, because such cases turn on the "elusive factual question of intentional discrimination." *Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir.1985) (quotation and citation omitted); *see also Pullman–Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) ("Treating issues of intent as factual matters for the trial court is commonplace.").

The Findings and Recommendation also concluded that plaintiff failed to establish his race discrimination claims based on the existence of a hostile work environment. Findings and Recommendation at 14. To prevail on his hostile work environment claim, plaintiff must show that (1) he was subjected to verbal or physical conduct of a racial nature, (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive environment. *Gregory v. Widnall,* 153 F.3d 1071, 1074 (9th Cir.1998) (citations omitted). "The more outrageous the conduct, the less frequent must it occur to make a workplace hostile." *Id.* (citation omitted).

The Findings and Recommendation found, and this court concurs, that plaintiff established he was subjected to such conduct and that the conduct would have been considered abusive and hostile to a reasonable Hispanic. Findings and Recommendation at 13. However, the Findings and Recommendation also concluded that plaintiff failed to establish that the behavior was unwelcome to him personally. *Id.* at 13. The Findings and Recommendation relied on the fact that plaintiff had used similar racist terms in reference to his Hispanic heritage and that he waited until May 2003, four years after he was hired, to complain about the conduct. *Id.* at 13–14. Accordingly, the Findings and Recommendation concluded that plaintiff failed to establish a *prima facie* case for a hostile work environment because he failed to show unwelcomeness.

■ Plaintiff objects to the conclusion in the Findings and Recommendation that plaintiff failed to demonstrate the conduct was unwelcome to him personally. This objection is well-taken. Evidence that an employee has complained about the behavior indicates that the employee finds the behavior to be unwelcome. *Nichols v. Azteca Restaurant Enter.'s, Inc.,* 256 F.3d 864, 873–74 (9th Cir.2001).

Plaintiff was offended by the comments when they first began upon his hire in May 1999. He advised Wallace of this fact, but because Wallace was his training officer and he was a probationary employee who could be terminated for no reason, he refrained from filing an official complaint. Deposition of Raymond Sizemore (Sizemore Deposition) at 120–121. Plaintiff complained about Wallace's behavior to Sergeant Jim Rodriguez approximately ten times, both before and after Wallace's promotion in April 2003. Deposition of Jim Rodriguez at 27.

In May 2003 plaintiff complained to Wallace's supervisor, Simpson, about Wallace's derogatory comments. Sizemore Deposition at 132–33. Simpson failed to take any action against Wallace and responded to plaintiff that the he viewed the matter as a personality conflict. *Id.* at 136. Plaintiff continued to complain to Simpson.

In September 2003 plaintiff informed Wallace he objected to the racist comments. Wallace apologized, and the comments significantly decreased. The comments did not cease altogether, however, and after one comment in December 2003 plaintiff complained to Chief Harper. He expressed frustration at how long the situation had been going on and the lack of response by Simpson. Sizemore Deposition at 157–158. Harper responded with a threat that any official complaint would result in plaintiff's life becoming complicated and uncomfortable, and that his days as a police officer would be numbered. *Id.* at 159.

In January 2004 plaintiff again complained to Simpson and Harper, and informed Harper that he had hired an attorney. In February 2004 plaintiff filed a complaint with the Bureau of Labor and Industries.

This evidence shows that plaintiff repeatedly complained about Wallace's conduct. These repeated complaints are more than sufficient to meet plaintiff's burden of showing "very little" evidence to survive summary judgment. *See Wallis,* 26 F.3d at 889.

The fact that plaintiff engaged in activities similar to the alleged conduct does not compel a determination that he did not consider that conduct unwelcome. An employee is entitled to draw a distinction between objectionable and unobjectionable conduct. *Nichols,* 256 F.3d at 873. Moreover, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Plaintiff asserts that the delay in complaining about Wallace's conduct to anyone other than Rodriguez was because he was afraid of losing his job. The threatening response by Harper when plaintiff did make an official complaint indicates that plaintiff's fears were well-founded. However, it is for the jury to make such a determination.

Plaintiff also objects to the Findings and Recommendation's conclusion that plaintiff's hostile work environment fails because defendants took appropriate remedial action. Findings and Recommendation at 14. This conclusion is in tension with the Findings and Recommendation's later conclusion that the City and Harper did not respond appropriately, but instead retaliated. *Id.* at 15–16. This court agrees with the Findings and Recommendation's conclusion that plaintiff produced sufficient evidence that Harper and the City retaliated and, therefore, defendants cannot be deemed to have taken appropriate remedial action.

### 2. First Amendment Retaliation

Plaintiff also objects to the finding that his complaints about discrimination were a

personal employment grievance and do not qualify as protected speech. Findings and Recommendation at 18.

■ Courts undertake a three-part inquiry when a public employee alleges unlawful discrimination against a governmental entity for violations of free speech. This inquiry asks whether: (1) the speech at issue was constitutionally protected; (2) the speech was a motivating factor in the discriminatory actions; and (3) the governmental entity would have taken the same action even in the absence of the protected speech. *See Bd. of County Comm'rs Wabaunsee Co., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996). To prove that speech is constitutionally protected, a plaintiff must show that the speech involved a matter of public concern and that the plaintiff's interest in the speech outweighed the defendant's interest in avoiding workplace disruption. *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). The threshold inquiry is whether a public employee's statements substantially address a matter of political, social, or other community concern. *Roe v. City & County of San Francisco*, 109 F.3d 578, 584 (9th Cir.1997). If not, the First Amendment is not triggered and all other inquiries are irrelevant.

■ Speech is not of public concern when it deals solely with individual personnel disputes and is irrelevant to the public's evaluation of the governmental agency's actions. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983). However, if the speech concerns information that society should know about to make informed decisions about the operations of the government, that speech merits the highest degree of constitutional protection. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003) (citation omitted). "It is only when it is clear that . . . the information would be of *no* relevance to the public's evaluation of the per-

formance of governmental agencies that speech of government employees receives no protection under the First Amendment." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 978 (9th Cir.2002) (emphasis in original) (internal quotation and citation omitted).

■ The Ninth Circuit has determined that a "run-of-the-mine single-plaintiff discrimination case" may meet the public concern test. *Alpha Energy*, 381 F.3d 917, 926 (9th Cir.2004). Unfair discrimination and unfair treatment of job applicants are matters of public concern. *Rendish v. City of Tacoma*, 123 F.3d 1216, 1224 (9th Cir.1997). When government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, including speech about invidious discrimination, whether it is a single act or a pattern of conduct, that speech is inherently a matter of public concern. *Alpha Energy Savers Inc. v. Hansen*, 381 F.3d at 926. "Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole—conduct in which the public has a deep and abiding interest." *Id.* at 926–27. Accordingly, plaintiff's speech regarding the racial discrimination of public officials is a matter of public concern. *Id.; see also Rendish*, 123 F.3d at 1224. This court cannot say as a matter of law that plaintiff's speech regarding the acts of racial discrimination of supervisory employees in the Police Department is of *no* relevance to the public's evaluation of the Police Department. *Ulrich*, 308 F.3d at 978.

■ Moreover, the critical question in the analysis of a governmental employee's claim of First Amendment retaliation is identifying the motive for the speech—

whether the point of the speech was to bring wrongdoing to light, to raise issues of public concern, or solely to further a purely private interest. *Roth v. Veteran's Admin. of the U.S.*, 856 F.2d 1401, 1406 (9th Cir.1988) (quotation and citations omitted). Plaintiff argues that his speech did not reflect a disagreement with a particular personnel decision affecting only him, but was a protest against ongoing unlawful racial harassment and discrimination and the fact that a public agency was allowing a superior officer to engage in such unlawful behavior. Accordingly, plaintiff argues, the complaints were not solely on his behalf or solely related to his own interests. In light of the evidence in the record, this court cannot determine, as a matter of law, that plaintiff's purpose in his speech was solely to further a purely private interest. *Roth*, 856 F.2d at 1406. That is a question of fact more appropriately decided by a jury.

Regarding plaintiff's First Amendment retaliation claims against the individual defendants, plaintiff failed to demonstrate a *prima facie* case of retaliation by defendants Wallace and Simpson. However, as noted above, plaintiff met his burden of demonstrating retaliation by Harper.

### 3. Wrongful Discharge

 Plaintiff objects to the Findings and Recommendation's conclusion that he was not constructively discharged. Findings and Recommendation at 22. After a *de novo* review of the record, the Findings and Recommendation, and the objections, this court finds the analysis of the magistrate on this issue to be sound. Plaintiff's objections in this regard are overruled.

### 4. Intentional Infliction of Emotional Distress

 The Findings and Recommendation concluded that plaintiff "failed to present facts to support his claim that Wallace, Simpson, or Harper subjected plaintiff to conduct that exceeded 'all possible bounds of decency' or could be characterized as 'atrocious.'" Findings and Recommendation at 23. Plaintiff objects to this conclusion as invading the province of the jury.

After a *de novo* review, this court concurs with the analysis of the Findings and Recommendation and concludes that plaintiff failed to present an issue of material fact with regard to his claim for intentional infliction of emotional distress.

### CONCLUSION

For the foregoing reasons, defendant's objections are DENIED and plaintiff's objections are SUSTAINED IN PART, and DENIED IN PART.

Pursuant to plaintiff's concession, the Department is granted summary judgment on all claims and shall be dismissed from this action. The Motion for Summary Judgment [55] filed by the City, Harper, and Simpson is GRANTED as to plaintiff's claims for (1) wrongful discharge; (2) intentional infliction of emotional distress; (3) punitive damages against Harper; (4) retaliation under § 1983 based on Equal Protection violations against all defendants; and (5) retaliation based on violations of the First Amendment and § 1981 against Simpson. This Motion is DENIED as to plaintiff's claims for (1) racial harassment and discrimination under § 1981, § 1983, Title VII, and Oregon law; (2) retaliation for violations of the First Amendment and § 1981 against Harper; (3) punitive damages against Simpson; and (4) retaliation for violations of the First Amendment, § 1981, Title VII, and Oregon law against the City.

The Motion for Summary Judgment [30] filed by Defendant Wallace is GRANTED as to plaintiff's claim for (1) intentional infliction of emotional distress; (2) punitive damages; and (3) retaliation for violations of the First Amendment, § 1981, and

§ 1983 Equal Protection. This Motion is DENIED as to plaintiff's claim for racial discrimination and harassment under § 1983 and § 1981.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

ASHMANSKAS, United States Magistrate Judge.

Raymond Sizemore ("Plaintiff") brought this action against his former employer and supervisors alleging racial discrimination and retaliation, violation of his first amendment and equal protection rights, intentional infliction of emotional distress and constructive discharge. The City of Dallas (the "City"), the Dallas Police Department (the "Department"), Chief James Harper, Sergeant John Wallace and Lieutenant Tom Simpson (collectively the "Defendants") move for summary judgment against all of Plaintiff's claims.

### Background

The City hired Plaintiff as a police officer in May 1999. During the first few weeks, he was trained by then-officer Wallace, who referred to Plaintiff on several occasions as a "stupid fucking Mexican."[1] Sizemore Depo. at 121. Plaintiff complained to Wallace but did not report him to a supervisor because Plaintiff was on probationary status and did not want to jeopardize his job with the City. Thereafter, Plaintiff and Wallace were friendly and socialized occasionally away from the job.

On April 15, 2003, Wallace was promoted to sergeant. Plaintiff alleges that after his promotion, Wallace continued to harass him because of his race. Plaintiff reported Wallace's behavior to Simpson, Plaintiff's supervisor, in May 2003. Plaintiff was unable to provide any specific examples of discriminatory conduct at this time and Simpson did not act on the report.

In June 2003, Plaintiff was talking about his upcoming vacation to San Diego, California, to attend his uncle's retirement party and his cousin's quinceniette (fifteenth birthday celebration). Wallace referred to the celebration as "Beanerfest 2003" and commented that "Those greasy little fuckers can cook." Sizemore Depo. at 143–45. Wallace also said something like I hate "Mexicans wasting [my] tax dollars," referring to Hispanics using welfare money to throw parties. Sizemore Depo. at 63.

While having lunch in July 2003, Plaintiff advised Simpson that Wallace's behavior was continuing. Simpson characterized the situation as a "personality conflict" and, again, did not act on Plaintiff's complaint. Shortly thereafter, Wallace commented on Plaintiff's relationship with a white female as "brown meat and white meat getting together." Sizemore Depo. at 113–14.

In September 2003, Plaintiff was not hired for a job he had applied for in Oceanside, California. Upon hearing this, Wallace commented "You don't want to work with those greasy fucking spics. You're better than that." Sizemore Depo. at 86. That same month, Wallace made racial comments about another Hispanic officer, Carlos Barrientos, whom he described as a "Mexican, Cuban, spic, whatever." Sizemore Depo. at 88. On one occasion, Wallace overheard a couple of officers questioning Barrientos' handling of a file and remarked "Leave it to a beaner to fuck up a good case." Sizemore Depo. at 87. Upon learning that Barrientos had resigned, Wallace commented "That's what we get for hiring too many Mexicans." Sizemore Depo. at 86.

Plaintiff brought Wallace's comments to Simpson's attention again in September

---

1. Plaintiff's father is Caucasian and his mother is Hispanic.

2003. Simpson advised Plaintiff to talk one-on-one with Wallace, let him know that Wallace's conduct offended him and ask him to stop. Plaintiff confronted Wallace later that month. He told Wallace that he didn't care for him, he thought Wallace was singling him out because of his race based on several comments that Wallace had made and he was fed up with it. Sizemore Depo. at 147. Wallace apologized for his behavior and assured Plaintiff that it would not happen again. Sizemore Depo. at 147–48.

About this time, Plaintiff complained to Officer Justin Stevenson, vice president of Plaintiff's labor union, about Wallace's behavior and asked if the union offered any discrimination resources. Plaintiff described Wallace's racially derogatory comments and explained that he felt Wallace was "overbearing" toward Plaintiff in his supervisory capacity. Plaintiff was concerned about retaliation from Wallace and wanted Stevenson to be aware of Wallace's discriminatory statements.

Stevenson had heard Plaintiff use racial terms and commented that Plaintiff regularly threw the "race card" into the mix. Stevenson Depo. at 34. Plaintiff referred to his shift as "the brown shift working together" and referred to the single Caucasian on his shift as "the white boy on the dark boy's shift." Stevenson Depo. at 33–35. Stevenson was not surprised that Wallace did not realize his racial comments were offensive to Plaintiff based on Plaintiff's regular joking about "brown power." Stevenson noticed that once he explained this to Plaintiff, Plaintiff's use of the racial comments diminished.

The City installed and began using a new system for writing police reports in October 2003. Plaintiff alleges that Wallace heavily scrutinized his reports and returned a number of reports for correction or completion. On one occasion, Wallace returned a report, advised Plaintiff that he had incorrectly applied the law and instructed Plaintiff to arrest and charge the suspect. On another, Wallace complained that Plaintiff had failed to designate the proper race of an individual on a form, and stated that "when in doubt, white is right." Sizemore Depo. at 71–72. Plaintiff admits that Sergeant's Ron Ritenour, Lee Ingram, and Jim Rodriguez, as well Simpson, all returned reports to Plaintiff for corrections and that he did not consider these actions to be racially motivated. Plaintiff reported this "retaliation" to Stevenson in late 2003.

On December 5, 2003, Wallace greeted Plaintiff in Spanish saying "Hey, Vato, where did you go homey esse?" Sizemore Depo. at 85. Plaintiff had used a similar greeting with other Hispanic officers but was offended when Wallace said it in a Latino accent. Plaintiff complained to Simpson, who had heard the comment and laughed about it. He also mentioned the incident to Chief Harper, who advised Plaintiff to continue working with Simpson.

Plaintiff discussed Wallace's behavior with Chief Harper again on December 17, 2003. Harper told Plaintiff that he needed to file a formal complaint before the City could respond to the discrimination allegations. He then warned Plaintiff that if he filed an official complaint, "something to the effect of [his] days would be numbered" and "until that date came, [his] life would become complicated and rather uncomfortable." Sizemore Depo. at 159. Additionally, Harper mentioned that Plaintiff's "career opportunities in Southern California would be greatly diminished." Sizemore Depo. at 160.

In January 2004, Wallace was allegedly heard referring to "Martin Luther Coon Day" while talking on the telephone. Sizemore Depo. at 161. Plaintiff complained to Simpson about this specific statement and

Simpson initiated an investigation by talking with Wallace and the officers on duty at the time the statement was made. At that time, Simpson advised Plaintiff that he had previously engaged in an informal investigation into Plaintiff's complaints but that he had been ordered to stop the investigation by Chief Harper. However, Simpson later scheduled Wallace to attend a cultural awareness class on March 9, 2004.

Plaintiff retained legal counsel in January 2004. When he advised Chief Harper of this action, Chief Harper stated "What in the hell did you do that for?" Sizemore Depo. at 165. On February 3, 2004, Plaintiff filed a complaint with the Bureau of Labor and Industries ("BOLI"). Plaintiff alleges that the City then retaliated against him by: 1) cancelling an awards banquet, which Plaintiff had organized in the past; 2) denying Plaintiff's requests to participate in the honor guard on a number of occasions, informing Plaintiff that "we don't need a crazy guy out there with a gun" (Sizemore Depo. at 181); 3) denying Plaintiff's request to participate in taser training; 4) initiating two internal investigations against Plaintiff; and 5) ridiculing Plaintiff in front of other officers for issuing separate citations during a single stop. In the summer of 2004, Chief Harper told Plaintiff, "Who knows how long you'll be around with all the crap you are pulling" and "Why do you want to be here anyway? You're a smart guy, why do you want to be a martyr?" Sizemore Depo. at 201, 212. In September 2004, Plaintiff left his employment with the City and moved to San Diego, California.

### Preliminary Procedural Matters

Defendants assert that the Department should be dismissed from the action because it is not a "person" subject to liability under either 42 U.S.C. §§ 1981 or 1983 and is not a public body that can be sued under the Oregon Tort Claims Act. Plaintiff agrees with the dismissal of the Department as long as the City remains liable for the acts of the Department and its employees. Accordingly, the Department should be granted summary judgment on all claims and dismissed from this action.

Defendants object to specific evidence presented by Plaintiff on the grounds of hearsay, irrelevancy and competency, as well as statute of limitations. With the exception of background information, the court has considered only that conduct occurring within the statute of limitations in determining the liability of the Defendants. Similarly, while the court has considered most of the objectionable evidence, it did not rely exclusively on such evidence in reaching its decision. Accordingly, the evidence objected to by the Defendants was not outcome determinative and the motions to strike should be denied as moot.

### Legal Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific*

*Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. The Ninth Circuit, however, has stated, "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). When the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *Id.*

Special rules of construction apply to evaluating summary judgment motions: the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The Ninth Circuit has reiterated that a high standard exists for granting of summary judgment in employment discrimination cases. *Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1410 (9th Cir. 1996) (holding that courts should require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry—one that is most appropriately conducted by the fact-finder, upon a full record) (citations omitted); see also *Lam v. University of Hawaii,* 40 F.3d 1551, 1563 (9th Cir.1994) (quoting *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991)).

*Discussion*

Plaintiff's claims for employment discrimination and retaliation, brought under Section 1981, Section 1983, Title VII and state law are all evaluated under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Court held that a plaintiff may establish discrimination by direct evidence of discriminatory motive. Because direct evidence is rarely available, the Court allowed a plaintiff to indirectly establish employment discrimination with a three-step process. First, the plaintiff must make a *prima facie* showing of retaliation or other discriminatory action on the part of the employer. Second, if the plaintiff makes such a showing, then the burden shifts to the employer to put forth a legitimate reason for the adverse action. The plaintiff must then demonstrate that the employer's proffered justification is a pretext for discrimination. *Washington v. Garrett,* 10 F.3d 1421, 1431–32 (9th Cir. 1993).

**Racial Discrimination**

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Additionally, Sections 1981 and 1983 and applicable state statutes provide relief for race-based discrimination. To prevail under Title VII claim, Section 1981 [2] or Section 1983 [3] or state law [4]; an

---

**2.** To establish a claim under section 1981 plaintiff must prove that he or she was sub-

jected to intentional discrimination based

employee must establish a *prima facie* case of discrimination.

Plaintiff's *prima facie* case of unlawful employment discrimination on the basis of his race may be established by either direct or circumstantial evidence. "Direct evidence is defined as 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Enlow v. Salem–Keizer Yellow Cab Co., Inc.,* 389 F.3d 802, 812 (9th Cir.2004)(quoting *Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 426 (8th Cir.1999)). Or, stated more succinctly, "direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998)(citing *Davis v. Chevron,* 14 F.3d 1082, 1085 (5th Cir.1994)). Not every comment about a worker's race is direct evidence of a discriminatory motive. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" *Hartung v. Cae*

*Newnes, Inc.,* 229 F.Supp.2d 1093, 1100 (D.Or.2002)(quoting *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990)). In the absence of direct evidence, unlawful discrimination is presumed if plaintiff can show that (1) he belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) other employees with qualifications similar to his were treated more favorably. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

The record provides direct evidence supporting Plaintiff's discrimination claim. It is clear that Wallace made a number of racist comments directed at Plaintiff and that Harper threatened to retaliate against Harper if Plaintiff continued to complain about Wallace's comments. However, the fact that Wallace was not a decision-maker with regard to Plaintiff, the length of time that passed between the time the racist comments stopped and Plaintiff's constructive discharge, and the nature of the allegedly retaliatory acts that took place during 2004, prevent the court from finding that Plaintiff has established a *prima facie* case of discrimination based on direct evidence.

upon his or her race, rather than solely on the basis of the place or nation of their origin or their religion. A plaintiff may seek relief under both Title VII and section 1981 for racial discrimination in employment. *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1412 (9th Cir.1987). The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim. *Id.*

**3.** Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights. 42 U.S.C. § 1983; See also *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). Thus, to state a claim for relief in an action brought under § 1983, plaintiff must establish that he was deprived of a right secured by the Constitution or laws of the United States, and that the

alleged deprivation was committed under color of state law. See *Azer v. Connell,* 306 F.3d 930, 935 (9th Cir.2002).

**4.** Oregon courts have consistently held that case law developed by the federal courts in the interpretation of Title VII can be used to interpret Chapter 659 of the Oregon Revised Statutes because the statutory schemes are similar and Chapter 659 is patterned after Title VII. *Vaughn v. Pacific N.W. Bell Tel. Co.,* 289 Or. 73, 86, 611 P.2d 281,(1980); *Seitz v. Albina Human Resources Center,* 100 Or.App. 665, 672–73, 788 P.2d 1004 (1990); *Goldsborough v. Eagle Crest Partners, Ltd.,* 105 Or.App. 499, 503, 805 P.2d 723 (1991), aff'd, 314 Or. 336, 838 P.2d 1069 (1992); *Winnett v. City of Portland,* 118 Or.App. 437, 442, 847 P.2d 902 (1993); *Mains v. II Morrow, Inc.,* 128 Or.App. 625, 634, 877 P.2d 88 (1994).

The parties agree that Plaintiff has met three requirements of a *prima facie* case of discrimination based on circumstantial evidence. The only element in dispute is whether Plaintiff has proven that he was subjected to an adverse employment decision. A majority of the federal Circuit Courts, including the Ninth Circuit, take an expansive view of the type of actions that can be considered adverse employment actions in the Title VII context. See, e.g., *Ray v. Henderson,* 217 F.3d 1234, 1241–1243 (9th Cir.2000). In *Ray,* the Ninth Circuit held that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity. Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer. *Id.* at 1241; *Brooks v. City of San Mateo,* 229 F.3d 917, 929 (9th Cir.2000). Moreover, in *Vasquez v. County of Los Angeles,* 349 F.3d 634, 646 (9th Cir.2003), the Ninth Circuit determined that the standard—reasonably likely to deter employees from engaging in protected activity—was at least in part a subjective one as viewed by the charging party.

Viewing the facts in the light most favorable to Plaintiff, there is evidence that the City subjected Plaintiff to "adverse treatment." Specifically, Wallace returned a number of Plaintiff's reports for correction or completion and Harper cancelled the awards banquet, denied Plaintiff's requests to participate in the honor guard and taser training, and initiated two internal investigations against Plaintiff, that were later dismissed. Under the broad definition the Ninth Circuit has adopted for the term "adverse employment action," the court can not say, as a matter of law, that all of this conduct falls outside of these parameters. The fact that Plaintiff may not have suffered any loss of pay or benefits from this treatment is relevant to his claim for damages, not to his *prima facie* case. *Hashimoto v. Dalton,* 118 F.3d 671, 676 (9th Cir.1997)("That his unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability.").

However, even assuming that Plaintiff has established the existence of an adverse employment action, the court is not convinced that any of these acts occurred solely because of Plaintiff's race. With regard to Wallace's conduct, the evidence establishes that other superiors returned reports to Plaintiff for correction or completion and Plaintiff did not consider these acts to be racially motivated. Additionally, this conduct occurred after Plaintiff complained to Wallace about his statements and the offensive statements had virtually stopped.[5] Similarly, Harper did not engage in any of his adverse treatment of Plaintiff until after Plaintiff complained to Harper about Wallace and Wallace's discriminatory comments had ended, with the exception of the "Martin Luther Coon Day" comment, which would be offensive to African Americans rather than Hispanics and, therefore, not directed at Plaintiff. Based on these established facts, the court finds that the adverse employment actions were not based on Plaintiff's race, but

---

**5.** It is also relevant that Wallace allegedly engaged in racially offensive conduct since Plaintiff was hired in May 1999 but that no adverse employment action occurred until after Plaintiff complained to Simpson and Wallace in the summer and fall of 2003.

rather on Plaintiff's complaints about Wallace's racially derogatory comments.

Plaintiff may also rely on the existence of a hostile environment to support his race discrimination claim. To establish a *prima facie* hostile work environment claim, an employee must show that: (1) he was subjected to verbal or physical conduct because of his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter conditions of his employment and create an abusive work environment. *Gregory v. Widnall,* 153 F.3d 1071, 1074 (9th Cir. 1998). To survive summary judgment, a plaintiff must establish a genuine issue of material fact on whether his workplace was both objectively and subjectively racially hostile, i.e. one that a reasonable person would find hostile or abusive and one that the victim, in fact, perceived it to be and whether the City failed to take adequate remedial and disciplinary action. *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1462–1463 (9th Cir.1994); see also *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Courts should consider the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating, and whether it unreasonably interfere[d] with an employee's work performance. *Harris v. Forklift Systems,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

For the purposes of this motion, Defendants concede that Wallace made numerous racially derogatory comments about Hispanics in Plaintiff's presence. Consequently, Plaintiff has met his burden of showing that he was subjected to verbal or physical conduct because of his race. The issue before the court is whether such conduct was unwelcome and pervasive

enough to alter the conditions of Plaintiff's employment.

According to the complaint, Wallace's racial comments began at the time Plaintiff was hired by the City. The comments made by Wallace about Hispanics, as set forth above, were harsh, crude and, on occasion, vulgar. Based on this evidence, the court is convinced that a reasonable Hispanic would have found this conduct hostile and abusive. Plaintiff, on the other hand, did not seem overly offended by the comments.

Prior to April 2003, when Wallace was promoted to Sergeant, Plaintiff did not complain about Wallace's conduct and voluntarily socialized with Wallace away from work. Plaintiff complained about Wallace to one of his supervisors for the first time in May 2003—four years after Plaintiff was hired and the comments began. He confronted Wallace in September 2003, advising him that the racial comments were offensive and asking Wallace to stop. Wallace apologized and, for the most part, Wallace's racially offensive conduct stopped at this time.[6] This evidence supports Defendants' argument that Wallace's conduct was not "unwelcome" to Plaintiff.

Defendants' argument is also supported by Plaintiff's common use of racially derogatory terms and references to his Hispanic heritage. The record contains a number of affidavits from Plaintiff's coworkers that describe Plaintiff's frequent use of derogatory racial comments while on duty. Wallace reported that Plaintiff had taught him two Spanish greetings, regularly used them when greeting Wallace and did not complain to Wallace about his use of the greetings. Officer Steve Dankenberg remembered Plaintiff using Spanish slang greetings at shift briefings, referring to

---

**6.** Wallace did greet Plaintiff with the phrase "Hey, Vato, where did you go homey esse?" in December 2003, and commented on "Martin Luther Coon Day" in January 2004.

white officers as "whitey" or "cracker" and once calling Dankenberg his "nigger." Dankenberg Aff. at 1. Other officers heard Plaintiff refer to himself as the "brown boy" and made comments such as "Why do you gotta be picking on the brown guy." Caudill Aff. at 1. Many officers testified that Plaintiff was the one who would initiate the racial banter and that other officers would, on occasion, respond in kind. Mason Aff. at 1–2. Officers from other cities who worked with Plaintiff on the Special Response Team reported hearing Plaintiff make jokes about his Hispanic ethnicity, referring to himself as the "token Mexican," and hearing Plaintiff refer to Caucasians as "white honkies." Mason Aff. at 1. An individual who attended high school with Plaintiff commented that both Plaintiff and his brother both made jokes about being Hispanic and that Plaintiff called himself a "beaner." Wilson Aff. at 2. Also, Plaintiff told Stevenson that he considered Wallace's comments to be inappropriate only after Wallace was promoted to Sergeant in April 2003. Based on this evidence, the court finds that no reasonable jury could conclude that Wallace's racial comments were truly offensive or unwelcome to Plaintiff.

Defendants have also established that they took appropriate remedial action. Once Wallace was advised that Plaintiff was offended by the comments in September 2003, Wallace stopped engaging in the offensive behavior. Similarly, the evidence establishes that when Plaintiff provided Simpson and Harper with specific complaints about Wallace, an investigation occurred and Wallace was required to attend a cultural awareness class on March 9, 2004. There is no evidence that Wallace made any racially offensive comments after this time. The court finds that Plaintiff has failed to support his claim for racial discrimination based on hostile environment.

Plaintiff has also asserted a claim of racial discrimination based on retaliatory acts by Wallace and Harper. To make out a *prima facie* case of retaliation, Plaintiff must establish that: (1) he engaged in protected activity, such as filing of a complaint alleging racial discrimination, (2) the employer subjected him to adverse employment actions, and (3) a casual link exists between the protected activity and the adverse action. *Manatt v. Bank of America, NA,* 339 F.3d 792, 798 (9th Cir. 2003).

Plaintiff alleges that Wallace retaliated against him by being overly critical in reviewing Plaintiff's incident reports after October 2003. As noted above, the evidence establishes that other superiors returned reports to Plaintiff for correction or completion and Plaintiff did not consider these acts to be racially motivated. Plaintiff does not deny that the reports returned by Wallace needed to be corrected and Rodriguez agreed that Plaintiff had made errors on at least one of those reports. Additionally, Wallace returned reports to non-Hispanic officers with similar complaints. Based on this evidence, the court finds that Plaintiff has failed to support a *prima facie* case of retaliation against Wallace.

The same is not true with regard to Plaintiff's claim against the City. Plaintiff has presented enough evidence to support a *prima facie* case of retaliation based on Harper's conduct. Plaintiff complained to Harper about Wallace's conduct. In response, Harper threatened to make Plaintiff's life complicated and uncomfortable and to greatly diminish Plaintiff's career opportunities in Southern California if Plaintiff pursued his complaints. Shortly thereafter, the adverse employment actions commenced. This is sufficient to meet Plaintiff's burden.

The City argues that it had legitimate reasons for the adverse actions. For example, Harper explains that he decided not to authorize the awards banquet in 2004 because he felt department morale was low and a banquet would not help. Harper Aff. at 3. However, Plaintiff has presented evidence that Harper blamed the low morale on Plaintiff's complaints about racial discrimination. Plaintiff's request to participate in a summer parade as part of the honor guard was denied because "We can't have a crazy guy out there with a gun." Sizemore Depo. at 181. (Query: If the City really felt Plaintiff was crazy and shouldn't be in public with a gun, why was Plaintiff still on the police force?)

Even assuming the City evidence is able to support its claim it had legitimate business reasons the adverse employment actions taken against Plaintiff after he filed his discrimination complaints, Plaintiff has sufficient evidence of pretext to meet his burden. Harper's statement to Plaintiff that he would make his life difficult and would sabotage any new employment prospects if Plaintiff pursued his claim against Wallace is direct evidence of retaliatory intent and is sufficient to present a genuine issue of material fact on the City's proffered justification. Plaintiff has stated a *prima facie* case of retaliation and should be allowed to proceed to trial on this claim.

### First Amendment Retaliation

Plaintiff also asserts that Defendants violated his First Amendment right to free speech when it retaliated against him for complaining about Wallace's racially derogatory comments. Plaintiff has failed to present evidence that either Wallace or Simpson engaged in any retaliatory conduct. Wallace and Simpson are entitled to summary judgment on this claim.

The City and Harper argue that Plaintiff's speech claim fails because his complaints were not "protected speech" entitled to protection under the First Amendment. Public employees cannot be forced to relinquish their First Amendment rights simply because they accept the benefit of public employment. *Tucker v. State of California Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir.1996) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). To establish a claim that a public employer has unlawfully infringed his constitutionally protected interest in freedom of speech, a public employee must show that the speech in question was constitutionally protected and was a substantial or motivating reason for an adverse employment action. *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1222 (9th Cir. 1996) (citing *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)). If the employee meets this burden, the government employer may avoid liability by establishing that it would have taken the same action regardless of the protected conduct. *Id.*

In order to be subject to First Amendment protection, a public employee's speech must address matters of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The court determines, as a matter of law, whether the speech allegedly giving rise to an adverse employment decision is protected. *Wheaton v. Webb-Petett*, 931 F.2d 613, 618 (9th Cir.1991). The United States Supreme Court has not articulated a precise definition of public concern. *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir.1987). It has stated, however, that expression that can be fairly considered as relating to a matter of political, social, or other concern to the community may be characterized as speech involving a matter of public concern, and has observed that whether particular statements ad-

dress a matter of public concern depends on their "content, form, and context." *Connick*, 461 U.S. at 146–48, 103 S.Ct. 1684. The Ninth Circuit has observed that speech by public employees is not properly characterized as of public concern "when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983). Speech concerning "issues about which information is needed or appropriate to enable the members of society" to evaluate the operation of their government is accorded the highest degree of constitutional protection. *Id.*, (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). Speech primarily addressing an employee's personal grievances is accorded less protection. See, *Allen*, 812 F.2d at 432.

Here, Plaintiff's speech was limited to complaints about Wallace's treatment of him. Plaintiff has presented evidence that Wallace made derogatory comments about other Hispanics. However, he fails to establish that his speech related to anything other than his relationship with Wallace. Plaintiff's speech is properly classified as a personal employment grievance and does not qualify as protected speech.

## Municipal and Individual Liability under Section 1983

The court recommends denying the City and Harper's motion for summary judgment on Plaintiff's retaliation claim. The City asserts that it can not be held liable for Harper's conduct under Section 1983. Similarly, Harper asserts that he is not liable under Section 1983 because his did not personally participate in the discriminatory behavior or because he is entitled to qualified immunity.

It is well settled that a municipality cannot be held vicariously liable for the unconstitutional acts of its employees based upon a *respondeat superior* theory. *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff must identify a municipality policy or custom that actually caused the injury to plaintiff. *Id.* at 693, 98 S.Ct. 2018. "The word 'policy' generally implies a course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Id.*

A section 1983 plaintiff may establish municipal liability in one of three ways. First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a 'longstanding practice or custom which constitutes the 'standard operating procedure of the local governmental entity.' Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993) (internal citations and quotations omitted).

There is no evidence that Harper acted in accordance with a formal governmental policy. However, Harper was the Chief of Police for the City at the time that he threatened and retaliated against Plaintiff

for complaining about Wallace's behavior. A reasonable factfinder could easily find that Harper had policy-making authority within the police department that he commanded. Based on this authority, Harper's actions were the actions of the City. The City is liable for Harper's actions in this instance.

Harper argues that he was not personally involved in the alleged racial harassment and is, therefore, not liable under Section 1983. Liability under Section 1983 may only be premised on a defendant's personal involvement in the alleged violation. See *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Palmer v. Sanderson*, 9 F.3d 1433, 1438 (9th Cir.1993). Thus, dismissal of Section 1983 claims is proper where a plaintiff fails to allege or prove that individual defendants "knew of or participated in activities connected to the alleged Section 1983 violations." *Ortez v. Washington County, Oregon*, 88 F.3d 804, 809 (9th Cir.1996)(cites omitted). Harper may not have been involved in the racially derogatory name calling. However, it is clear that he was personally involved in the threats made toward Plaintiff and in a number of employment decisions that adversely affected Plaintiff's job with the City.

Finally, Harper contends that he is entitled to qualified immunity. The qualified immunity analysis proceeds in two stages. The court must first inquire whether in viewing the facts in a light most favorable to plaintiff, a constitutional violation has been established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Id.* Conversely, if this threshold is passed, the court next examines whether defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The court has already determined that Plaintiff has stated a viable constitutional violation. The court now finds that such right, to be free from retaliation for complaining about race discrimination at the workplace, was clearly established in 2003 and that Harper should have been aware of such right.

## Constructive Discharge

To establish a claim of constructive discharge stemming from unacceptable working conditions, a plaintiff must prove:

(1) that the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employees position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

*McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841 (1995).

Plaintiff must clearly show intent on the part of the employer. *Id.* at 553, 901 P.2d 841. The determination of whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact. *Thomas v. Douglas, et al*, 877 F.2d 1428, 1434 (9th Cir.1989). To show constructive discharge, Plaintiff must at least show some "aggravating factors", such as a "continuous patterns of discriminatory treatment." *Id.* (cites omitted). Personal discomfort is not enough to sustain an action for constructive discharge. *Id.* Under Oregon law, the claim for wrongful discharge is

available where no other remedy is provided. *Nees v. Hocks*, 272 Or. 210, 218, 536 P.2d 512 (1975). An adequate statutory remedy will preempt an otherwise sufficient claim for common-law wrongful discharge. *Blevins v. Albertson*, CV 99–532–HA at 13 (Opinion & Order, April 30, 2001); *Walsh*, 278 at 352.

Plaintiff assert that he was forced to quit his job with the City as a result of Defendants' conduct. With regard to Wallace, Plaintiff admits that Wallace's last derogatory comment occurred, at the very latest, in January 2004, well before Plaintiff quit. Similarly, there is very little evidence in the record that Simpson engaged in discriminatory or retaliatory conduct after this time. Plaintiff has failed to establish a causal connection between the conduct of Wallace or Simpson and Plaintiff's decision to leave his employment.

Harper's conduct is also not sufficient to meet the standard for constructive discharge. Harper's refusal to let Plaintiff organize the awards banquet, serve on the honor guard or attend the taser training and his ridiculing of Plaintiff on one occasion over a period of eight to nine months did not create intolerable working conditions. The internal affairs complaints were investigated and dismissed, a fairly normal occurrence in the employment context. Also, Plaintiff has failed to show that he left his employment with the City solely because of Harper's retaliation. Plaintiff had been looking for a job in Southern California before any of the alleged harassment occurred and, on more than one occasion, had expressed a desire to move closer to his family. Based on Plaintiff's clear desire to leave the force and relocate to Southern California and the lack of aggravating factors or clear discriminatory treatment, the court finds that Plaintiff has failed to support his claim for constructive discharge.

In the alternative, Plaintiff's retaliation claim, which is based on primarily the same facts as his constructive discharge claim, survives the City and Harper's motion for summary judgment. Because of this, Plaintiff has an adequate statutory remedy for this conduct and his claim for constructive discharge is preempted.

**Intentional Infliction of Emotional Distress**

Under Oregon law, a claim for intentional infliction of emotional distress only lies where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203, 818 P.2d 930 (1991). It is the defendants' acts, rather than their motives, that must be outrageous. *Id.* at 204, 818 P.2d 930.

The Oregon courts have limited the term intent to include only those situations where the defendant " 'desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.' " *McGanty*, 321 Or. at 550, 901 P.2d 841 (1995)(quoting Restatement (Second) of Torts, § 46, comment I (1965)). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Christofferson v. Church of Scientology*, 57 Or.App. 203, 211, 644 P.2d 577 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)).

Again, Plaintiff has failed to present facts to support his claim that Wallace, Simpson or Harper subjected Plaintiff to conduct that exceeded "all possible bounds of decency" or could be characterized as "atrocious." Defendants are entitled to

summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

**Punitive Damages**

Plaintiff seeks punitive damages against Harper.[7] Harper asserts that Plaintiff has failed to establish the intentional conduct necessary to support his claim for punitive damages under Section 1983.

Punitive damages may be awarded under 42 U.S.C. § 1983 "when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir.1991), citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Plaintiff has presented evidence that Harper threatened to make his life miserable if Plaintiff pursued his racial discrimination claim against Wallace and that Harper engaged in adverse employment actions against Plaintiff thereafter. This is sufficient to raise a genuine issue of material fact with regard to Harper's state of mind.

### Conclusion

The motion for summary judgment (# 55) filed by the City, the Department, Harper and Simpson should be DENIED with regard to Plaintiff's claim for retaliation against the City and Harper, as well as Plaintiff's claim for punitive damages on this claim, and GRANTED in all other respects. Defendant Wallace's motion for summary judgment (# 30) should be GRANTED. Defendants' motions (# 75 and # 81) should be DENIED as moot.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **June 6, 2006.** If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

May 26, 2006.

---

7. Plaintiff seeks punitive damages against the individual defendants. However, because the court has recommended dismissal of all claims against Simpson and Wallace, Harper is the only individual defendant to which this argument applies.